# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 97-31267
Summary Calendar

---

LARRY WEBER,

Plaintiff-Appellant,

versus

GAINEY'S CONCRETE PRODUCTS, INC.,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
(96-CV-4173)

---

September 21, 1998

Before Judges WIENER, BARKSDALE and EMILIO M. GARZA, Circuit Judges.

Per Curiam[*]

In this retaliatory discharge case, Plaintiff-Appellant Larry Weber appeals the district court's grant of Defendant-Appellee Gainey's Concrete Products, Inc.'s ("GCP") motion for judgment as a matter of law,[2] holding that Weber's untoward behavior in response to GCP's alleged adverse employment action constitutes an independent, legitimate and nondiscriminatory reason for firing him.

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] FED. R. CIV. P. 50(a), pertaining to judgments as a matter of law, makes clear that a district court should invoke this rule only in a jury trial, in which the judge is not the fact finder. In a bench trial, the appropriate vehicle for dismissing a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial findings. This section replaces the part of Rule 41(b) pertaining to involuntary dismissals. Unlike the standard applicable in judgments as a matter of law, when dismissing a case pursuant to Rule 52(c), a court is not required to make any special inferences or review the facts in the light most favorable to the plaintiff. See Sanders v. General Servs. Admin., 707 F.2d 969, 971 (7th Cir. 1983). A judgment on partial findings may be entered by the court "at any time it can appropriately make a dispositive finding of fact on the evidence." FED. R. CIV. P. 52 advisory committee's note. It is evident from the magistrate judge's reasons for judgment that her ruling on GCP's motion was in accordance with Rule 52(c), and will therefore be treated as a judgment on partial findings.

Concluding that the court's holding is correct, we affirm.

# I

## FACTS AND PROCEEDINGS

Larry Weber is an African-American male who was employed by GCP for approximately eighteen months. During the course of his employment, Weber held several different positions, including road man, laborer, and concrete finisher. He received three pay raises during this time. On July 25, 1994, Weber was fired by Edgar Gainey ("Edgar"), plant manager at GCP's Holden, Louisiana facility. At the time of Weber's discharge, GCP also operated a facility in Springfield, Louisiana. Richard Gainey ("Richard"), the late president of GCP and Edgar's brother, maintained his office at the Springfield location.

Earlier that month, two positions had become available at the Holden plant —— operator of the cherry picker and operator of the batch plant. Weber contends that he consulted Richard about filling one of these positions, and was told that to be considered for either job he would need to learn how to operate the equipment. Thereafter, claims Weber, he began to familiarize himself with both the cherry picker and the batch plant whenever he had a free moment.

In the week preceding his termination, Weber was temporarily transferred to the Springfield plant to train a fellow employee in the construction of concrete tanks. On his return to the Holden facility on the morning of July 25, Weber learned that two white men had been chosen to fill the job vacancies. The sequence of events after this point is in dispute. Weber claims that he immediately went to Edgar and asked why he had been passed over for the positions. Weber avers that because he was unsatisfied with Edgar's response —— that Weber had not been considered because he was temporarily away from the plant —— he went to the office to call Richard but was prevented by Edgar from using the telephone. At this point, states Weber, he confronted Edgar with the accusation that the true reason he was not considered for the jobs was race. Weber then left the Holden facility to voice his complaint to Richard at Springfield.

According to Weber, Richard's response was that Weber should return to Holden and work

2

things out with Edgar.  Weber testified that when he got back to Holden, Edgar was very angry, and that a heated argument ensued.  Weber admitted that, during their argument, he and Edgar "hollered" at each other and became "hysterical."  Weber claims that Edgar stepped in close, face-to-face, in response to which Weber told Edgar to "get his funky breath" out of his face.  Although Weber could not remember whether he had cursed at Edgar, he admitted that it was entirely possible that he had used the "F" word.  Thereafter, Weber contends, Edgar told him that he could quit and that when he refused to quit, Edgar fired him.  This altercation took place outside Edgar's office in a common work area where other employees could and did hear the argument.

In contrast to Weber's two-confrontation version of the events, Edgar testified that he had no recollection that he and Weber ever discussed the matter until after Weber had returned from the Springfield plant.  Edgar recalled that, on the morning of July 25, Weber reported to work and then, without permission, left the facility; and that it was not until Weber's return that Edgar learned of Weber's interest in the batch plant and cherry picker positions.  Edgar testified that he explained to Weber that the positions had been filled, whereupon Weber proceeded to act in a hostile, rude, insubordinate, and highly inappropriate manner, stating, among other things, that he had been denied the positions because of his race.  At this point, Edgar maintains, he offered to arrange a transfer for Weber to the Springfield plant, but Weber declined.  Edgar concedes that following this confrontation, he fired Weber.  Edgar testified that this decision was based on several factors including Weber's (1) history of absenteeism and tardiness, (2) insubordination, (3) failure to ask permission before leaving the plant on the morning of July 25, (4) violation of the chain of command, and (5) false accusation of racism in the presence of other employees.

Weber filed suit against GCP in December 1996, following a timely complaint to the EEOC and its issuance of a right to sue letter.  In his original complaint, Weber alleged that (1) race was the sole reason that he was not considered for the positions, and (2) he was terminated in retaliation for complaining about GCP's discriminatory employment practices.  He subsequently withdrew the allegations of discrimination, leaving for trial only the charge of retaliation under Title VII.  A bench

3

trial was held in October 1997.[3] GCP moved for judgment as a matter of law at the conclusion of Weber's case. The trial court granted this motion, dismissing Weber's suit at his cost. A notice of appeal was timely filed.

## II

## ANALYSIS

A.    Standard of Review

The issue presented in this appeal is a mixed question of fact and law.[4] With respect to the trial court's underlying factual findings and factual inferences, we are bound by the clear error rule.[5] We review the court's legal conclusions de novo.[6]

B.    Applicable Law

Retaliation against employees for opposing unlawful employment practices committed by an employer is prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a):

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this title [42 USCS §§ 2000e-2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 USCS §§ 2000e-2000e-17]. (emphasis added).

We have previously held that the McDonnell Douglas three step burden-shifting analysis is applicable to Title VII unlawful retaliation cases.[7] In the first step, a plaintiff must present a prima facie case of retaliation by showing that (1) he engaged in statutorily protected expression, (2) an adverse employment action occurred, and (3) a causal connection existed between his expression and

---

[3] Weber and GCP consented to trial before a magistrate judge in accordance with 28 U.S.C. 636(c)(1).

[4] See Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 229 (1st Cir. 1976).

[5] See Downey v. Denton County, 119 F.3d 381, 385 (5th Cir. 1997); Reich v. Lancaster, 55 F.3d 1034, 1045 (5th Cir. 1995).

[6] See Downey, 119 F.3d at 385; Reich, 55 F.3d at 1045.

[7] See Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir. 1996).

4

the adverse action.[8]

Unlawful employment practices are defined in 42 U.S.C. § 2000e-2(a) as the "fail[ure] or refus[al] to hire" an individual, the discharge of an individual, or the discrimination by an employer "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Although to satisfy the first element of his prima facie case a plaintiff must prove that he opposed an "unlawful" employment practice, he need not prove that the employer actually engaged in such practice. Rather, the plaintiff is protected from retaliation if he had a reasonable belief that discrimination was occurring.[9]

It is well established, however, that not all activity in opposition to unlawful employment practices is protected.[10] For example, an employee who engages in conduct that is unreasonably hostile or aggressive or that interferes with an employee's job performance or an employer's right to conduct his business, relinquishes his statutory protection.[11] To determine when such a situation exists, "a court must balance the setting in which the activity arises and the interests and motivations of both employer and employee."[12]

If the employee successfully establishes a prima facie case, then the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its employment decision.[13] Then, if the employer is successful, the presumption of retaliation fades and the burden is returned to the

---

[8] See Grimes v. Texas Dep't of Mental Health & Mental Retardation, 102 F.3d 137, 140 (5th Cir. 1996).

[9] See Long, 88 F.3d at 304; Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir. 1981).

[10] See Payne, 654 F.2d at 1142.

[11] See id.; Jeffries v. Harris County Community Action Ass'n, 615 F.2d 1025, 1036 (5th Cir. 1980).

[12] Hochstadt, 545 F.2d at 232.

[13] See McDaniel v. Temple Indep. Sch. Dist., 770 F.2d 1340, 1346 (5th Cir. 1985).

employee, who must prove that the employer's articulated reason is a pretext for retaliation.[14]  The ultimate question in a retaliation case is whether the employee's protected activity was a "but for" cause of the adverse employment decision.  If the employee fails to carry that burden of persuasion, he cannot prevail.[15]

In granting GCP's motion for judgment as a matter of law, the trial court concluded that Weber was not engaged in protected activity by the time he suffered the adverse employment action. Consequently, held the court, GCP had a legitimate, nondiscriminatory, nonpretextual basis for firing him.  We affirm these conclusions.

The trial court found the following facts based primarily on her credibility determinations after hearing the live and frequently conflicting testimony of the protagonists.  On the date of his discharge, Weber behaved in a manner that was both insubordinate and disruptive.  After discovering that he had not been chosen to fill either of the job vacancies, Weber approached Edgar with his complaint, not in privacy but in the general work area at the Holden plant.  When Edgar's explanation for the hiring decisions failed to assuage Weber, he accused Edgar of being a racist.  This accusation was made in front of co-workers.  Without permission, Weber then left the work site to speak with Richard.  When Weber returned to Holden, he again confronted Edgar, letting himself be drawn into an angry dispute.  Weber admits to "hollering" at Edgar and telling him to "get his funky breath" out of his face.  Weber had an unassailable right to lodge a complaint for what he believed was discriminatory treatment, but not in a manner that was found to be insulting and inappropriate.

The magistrate judge concluded that Weber's choice of forum improperly challenged the chain of command in the workplace and adversely affected Edgar's ability to do his job. As such, the court concluded, the manner in which Weber complained fell outside the scope of statutory protection. After reviewing the testimony of Edgar, Weber, and his witnesses, we cannot say that the magistrate judge's findings were clearly erroneous or that her legal conclusions constituted reversible error.

---

[14]  Id.

[15]  See Jack v. Texaco Research Ctr., 743 F.2d 1129, 1131 (5th Cir. 1984).

In light of Weber's contumacious behavior, the trial court correctly held that GCP had a legitimate and nondiscriminatory reason for its adverse employment decision. Regardless of the validity of Weber's underlying complaint, he did not have a right to assail his supervisor orally or to challenge his authority in public. Available to Weber were a variety of appropriate channels through which he could have advanced his grievances. There is no question that Weber had a right to lodge a complaint, either formally or informally, with his employer. He also had a right to lodge a complaint with the EEOC and to file a lawsuit without fear of losing his job in retaliation. When Weber made the decision to act outside of these protected channels by engaging in disruptive and insubordinate behavior, however, he gave GCP an independent reason for firing him. Once this reason was proffered at trial by his employer, the burden shifted to Weber to show pretext. This he failed to do.

Edgar testified at trial that, in addition to his alleged history of absenteeism and tardiness, Weber was fired for the manner in which he angrily and combatively challenged GCP's employment decisions in public. Edgar cited insubordination, failure to ask permission to leave the plant, and violation of the chain of command as specific reasons for Weber's discharge. In response, the only evidence produced by Weber of GCP's alleged retaliatory motive was Edgar's admission that Weber's public accusation of racism factored into his employment decision. In light of this testimony, the trial court concluded that the substance of Weber's original complaint to Edgar —— GCP's alleged racial discrimination —— was not the "but for" cause of his termination. The court found instead that Weber's dismissal was the result of the bellicose and vituperative —— and thus unprotected —— nature of his protest.

Weber contends that the trial court failed to make a factual finding that GCP's adverse employment decision was specifically motivated by his conduct. Without this finding, Weber argues, the trial court erred in dismissing his case. We disagree. At trial, GCP articulated a variety of nondiscriminatory reasons for its decision to fire Weber. Except for a history of absenteeism and tardiness, each of these reasons related to Weber's inappropriate conduct on the date of his discharge. And Weber was unable to respond with any convincing proof of pretext. Given Weber's failure to

7

meet this ultimate burden, the magistrate judge did not err in concluding that Weber was not the victim of a retaliatory discharge.

## III

## CONCLUSION

Our review of the trial court's factual findings and legal conclusions convinces us that GCP was entitled to a Rule 52(c) judgment on partial findings, dismissing Weber's claims. For the foregoing reasons, the judgment of the district court is, in all respects,

AFFIRMED.